Albert E. CARLISLE, Plaintiff,

v.

Abraham A. RIBICOFF, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 9916.

United States District Court
N. D. Alabama, S. D.

Jan. 3, 1962.

Brobston & Brobston, Bessemer, Ala., for plaintiff.

Macon L. Weaver, U. S. Atty., Birmingham, Ala., for defendant.

ALLGOOD, District Judge.

This case comes before the court upon the pleadings and transcript of the record before the Appeals Council of the Social Security Administration.

Plaintiff under Title 42, U.S.C.A. Section 405(g), appeals an adverse decision of the Secretary of Health, Education and Welfare holding that plaintiff is not totally and permanently disabled within the provisions of the Social Security Act.

Plaintiff was born May 14, 1909, and completed the seventh grade of grammar school. (TR 31). He testified that he last worked in January of 1959. (TR 31). His last employment was as a truck driver for Pure Oil Company. (TR 32). Carlisle started to work for this company in March of 1945 and worked for them as a maintenance man and as a truck driver for approximately 14 years. (TR 33).

Plaintiff testified that in March of 1958 he suffered an attack of influenza, that he was off from work for about a week, he went back to work for two or three days and then was unable to work for about two weeks. At that time Dr. Meyer diagnosed his ailment as arthritis of the spine. He was put to bed, given heat treatments and sedatives. (TR 34). Plaintiff was hospitalized for a week at this time. (TR 35). Carlisle stated that he went back to work after about one month but that he was never able to drive a truck again. (TR 36). His employer [Pure Oil Company] gave him a job in the warehouse and told him to do whatever he felt like. (TR 36). He was unable to do any heavy work—from May until January he was allowed to hold this job in the warehouse hoping that his condition would improve,—however, it did not, and he was never able to do any substantial work. (TR 37). The Pure Oil Company came to the conclusion that plaintiff was permanently disabled. The company doctor examined him and in ac-

cordance with company policy, when Carlisle was found to be disabled, he was given sick leave for 12 months. He was paid full time one week for every year that he had worked for the company and for the balance of the twelve months one half time. (TR 38). After twelve months plaintiff was refunded his contributions to the company retirement fund. This ended his connection with Pure Oil Company. (TR 39). Plaintiff then applied for disability insurance under a policy he carried with Travelers Insurance Company. He was found to be disabled under the policy and the insurance company, since the first of 1960 has paid Carlisle $98.60 a month. (TR 39). Plaintiff testified that he tried to make a small garden, but that it did more harm than good, that he nearly killed himself trying. (TR 40). Plaintiff stated that he could not go up and down steps, that he could drive a little but not much, that he had considerable trouble with his back and legs and that about the only relief he could get would be from soaking in a tub of hot water and from taking anacin or aspirin or any kind of sedative. (TR 41).

Plaintiff testified that in March of 1959 he fell and fractured one of the vertebrae of his back, that he wore a cast for nearly 10 weeks and then had a steel brace that he wore for about two months, he felt that the brace made his back worse and does not wear it regularly. (TR 43). He stated that he could not sit long due to severe pain in his back, that a change in the weather made his back and leg pains more severe. (TR 46). Carlisle testified that he used a cane to help in crossing streets, getting up and down steps and curbs, and that it was easy for him to fall. (TR 50).

Dr. Paul Shannon, an orthopedic surgeon, examined Carlisle on January 10, 1961. Dr. Shannon found the patient, [Carlisle] to be a very large person, six feet, two or three inches, weighing 225 pounds, who got up and down from the chair and examining table in a guarded fashion like one would do with low back disability. Dr. Shannon found:

"Motions of the lumbar and lower one-half of the dorsal spine to be limited and muscle spasm present. There was tenderness of the lower one-half of the dorsal spine and the lumbar spine down to, and including the lumbosacral joint, and the adjacent musculature. There was very little motion in the lumbar area. Patient complained of pain on straight leg raising in the low back at 80 degrees on the right side and 90 degrees on the left side. Rocking the spine seemed to be very painful."

"There was hypesthesia of the right lateral thigh and the right achilles reflex was absent—and this is an objective finding of nerve irritation and, of course, perhaps a ruptured disc."

"There was a mild localized kyphosis of the spine at about the level of D-12—* * *."

"X-rays of the dorsal and the lumbar spine show old compression fractures of the bodies of the 6th and 8th dorsal vertebrae and the first and second lumbar lumbar vertebrae with associated marked post-traumatic hypertrophic lipping and arthritic change and there is moderate generalized decalcification and minimal kyphosis in the dorsal spine at the level of the compressed vertebrae. The changes are old and consistent with old healed fractures. The x-rays of the hips are negative except for mild osteoarthritis."

Dr. Shannon ended his report with this statement:

"This patient presents both clinical and x-ray evidence of back disability. *I am quite sure that in his age group he cannot do labor.*" (Emphasis added.) (TR 90–91–92).

Dr. Stephen L. Stigler, summed up an evaluation of plaintiff on July 18, 1960 with the following opinion:

"After reviewing the available data it is my opinion that Mr. Carlisle has an old fracture of the second lumbar vertebra. This has resulted

in some compression of the body of this vertebra and stimulated productive changes in the bone of L–1 and L–2. There is a mild Vertebra Osteoporosis. There is also evidence of osteoarthritis of the vertebrae. There is some possibility of some lumbar disc syndrome. I also feel that possibly some functional overlay exists."

"I would anticipate that a conservative approach to his back pain should be of some help. This would include the use of heat, the use of such drugs as Salicylates, and the use of a back support. Some of the pain may be due to the osteoporosis. This might be helped by the use of injections of Testostrone. Possibly some sedation would be indicated." (TR 83).

Dr. Henry Spira reporting July 8, 1960 of a neuropsychiatric examination of Mr. Carlisle came to this conclusion:

"The patient's family history [Patient's mother had 'trouble in her mind.' One of his brothers 'lost his mind' and has been in Brice Hospital for the past year. The patient's father died when the patient was 12 or 13 years old, and he had to go to work and had to do a man's work at a sawmill at the age of 16.] The long persistence of his back complaints, and some of the precipitating factors which have been discussed, suggest that there are more psychological factors involved here than we can uncover during one examination. My diagnosis is that of a psychophysiologic musculoskeletal reaction of moderate to marked degree, which has become superimposed upon whatever organic changes he may have in his spine. The 'back-breaking' work which he had to do as a youngster is doubtless one of the precipitating factors. Other factors are obvious, while still others are not accessible to us. *His physical and psychological disabilities have a tendency to mutually aggravate each other.*" (Emphasis added.) (TR 80).

Dr. John Fletcher Comer on March 28, 1960 in reporting on an examination of Carlisle gave as his opinion:

"The objective physical findings and x-rays authorized would not completely disable this man from an orthopedic standpoint. He may well have some degree of arthritis, and any activity if he has it could best be measured either by blood studies such as a Sed. rate or by Internal Medicine. Certainly this man has some psychological disability,—however, I am not a psychiatrist and I will make no effort to completely interpret this." (TR 76).

Dr. Motte on February 28, 1960 stated that in his opinion plaintiff would never be able to perform any gainful occupation and that Carlisle was unable to do any work at all. (TR 72 & 73.)

Dr. Benjamin Meyers also in February of 1960 reported that Carlisle was restricted in walking, bending and lifting, that he shall wear a long back brace—needed bed rest daily and walked with one cane.

Dr. Donald H. Slappey on November 17, 1959 reported:

"I do not feel that his [Carlisle's] response to a spinal fusion or other therapy would be very good." (TR 67).

Another doctor on October 20, 1959 stated that Carlisle was suffering from constant unlimited back pain and unable to perform any work. (TR 63).

A careful and thorough study of the entire record in this case does not give this court the impression that plaintiff is in any way faking his symptoms. Plaintiff has worked hard from the time he was sixteen years old and after he found that he could not continue to drive a truck worked for approximately eight months in the company warehouse. Plaintiff obviously has a combination of mental and physical ills that as Dr. Spira reported, "mutually aggravate each other."

Here again it appears that the Hearing Examiner has been influenced by the fact that plaintiff drew sick leave benefits and insurance disability benefits, concluding in his decision:

"It may well be that the receipt of the monthly disability benefits has removed to a great extent the economic motivation for the claimant to engage in substantial gainful activity inasmuch as he has no dependent other than his wife." (TR 17).

This court realizes that the examiners in all probability hear many cases that are without merit and therefore, may be prone to look on all claimants with suspicion. However, we must not lose sight of the fact that many of them are entitled to the benefits they claim. Every case stands on its own facts and circumstances.

■ The Hearing Examiner also stated in reaching his decision:

"It is a matter of common knowledge that there is a substantial number of individuals engaged in substantial gainful activity who suffer arthritis of the spine or osteoarthritis, and further, some of these individuals require constant medication for the alleviation of pain as a result of these conditions." (TR 17).

This is not a fair test and the Hearing Examiner is wrong in letting such a comparison effect his judgment. Applying the test, we all know many individuals who might without question be considered completely and totally disabled, but who work every day at gainful employment—some are blind, others have lost both hands or both legs yet are fully able to work and are highly successful in their chosen occupation. It would not be just or fair, nor would it make good sense, to say that because some with a specific handicap are not disabled all with the same handicap should be considered and expected to be able to perform any substantial gainful work.

This case in many ways is similar to Butler v. Flemming, 5 Cir., 1961, 288 F. 2d 591, which involved an individual who operated a domino hall to earn a living despite the fact that he was constantly in pain and had extreme nervous difficulties. As his condition worsened he was unable to continue this activity. The Referee or Hearing Examiner in a decision after a hearing took note of the claimant's poor physical condition and the fact that he had been unable to obtain work as a night watchman, but he determined that the possibility of claimant doing sedentary work had not been ruled out and therefore he was not entitled to disability benefits. The court reversed and rendered this decision pointing out that under the Act a person is not compelled to work, where to do so, subjects him to considerable pain. On the contrary, it is: "the purpose of much social security legislation is to ameliorate some of these rigors that life imposes." 288 F.2d 591 at 595.

In Aaron v. Fleming, M.D.Ala., 1958, 168 F.Supp. 291 Judges Rives found that the Referee had erroneously used a theoretical test wholly unrelated to the actual capabilities of the particular claimant, and then of the proper test said: "Implicit in this criterion (of ability to engage in substantial gainful activity) is that the gainful work be commensurate with plaintiff's educational attainments, his training and experience. * * *" 168 F.Supp. 291 at 295.

■ Based on the above cited authorities and this court's opinion that plaintiff in this case is even more disabled than Booker in Flemming v. Booker, 283 F.2d 321—1960, 5th Circuit—I am of the opinion that the Secretary's order in this case should be reversed:

Therefore, it is ordered, adjudged and decreed by the court that the decision of the Secretary be, and the same is hereby reversed, and this cause is remanded to the Secretary of Health, Education and Welfare, with direction that plaintiff be granted a period of disability and such disability insurance benefits as he would have been entitled to had his initial application been approved.